# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

|  |  |  |
|---|---|---|
| ROBERT MOODY, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.: 2:22-cv-88-LGW-BWC |
| L. GETER, *et al.*, | ) | |
| Defendants. | ) | |

## FEDERAL DEFENDANTS' MOTION TO DISMISS

COME NOW, Defendants Bolaji Aremu, Jessica Coleman, Lester Drury, Alisa Grimes, Samantha Hanchey, Kimberly Scott, and Daniel Ward (collectively, "Federal Defendants"),[1] by and through the United States Attorney for the Southern District of Georgia and the undersigned AUSA, and hereby respectfully move the Court for dismissal of the claims against them for failure to state a claim and for want of jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). The complaint fails to allege a cognizable *Bivens* claim and to plausibly allege defendants' liability under the Eighth Amendment; moreover, defendants are absolutely or qualifiedly immune from suit.

---

[1] Moody alleged claims against "two unknown Corrections Officers," (ECF Doc. 1, ¶ 22.), who appear in the case caption as "FNU, LNU C.O.s," (*Id.*, at p.1.). The court permitted these claims to proceed. ECF Doc. 30, at 4-5. However, no federal employees have been substituted or otherwise made parties to the case in the place of these John Doe parties. Accordingly, any unnamed federal employees are not obligated to respond to any discovery or the complaint. *See, e.g.*, *Rudd v. Providence Police Dep't*, No. CA 07-014 S, 2007 WL 9789666, at *1 (D.R.I. Apr. 13, 2007), *adopted by*, 2007 WL 9789668 (D.R.I. May 2, 2007) (citing cases). Even so, Moody's claim against these defendants should be dismissed for the reasons set forth herein.

**BACKGROUND**

**I.      Factual Background**

Plaintiff Robert Moody is an inmate in the custody of the U.S. Bureau of Prisons (Federal Register No. 22324-021). Ex. 1, Declaration of J. White, ¶ 3; *Id.*, Attach. 1 (Public Information Inmate Data).[2] He was convicted in the U.S. District Court for the Southern District of Georgia of Receipt of Child Pornography and sentenced to 151 months imprisonment, followed by 25 years of supervised release. *Id.* He is currently in BOP custody at the Federal Correctional Institution in Jesup, Georgia ("FCI Jesup"), in the low-security facility referred to as "Satellite Low" ("FSL"). *Id.*; ECF Doc. 1, Statement of Facts (SF) ¶ 12.

In January 2020, Moody "discovered an infection near the tip of his penis while performing personal hygiene in the shower." ECF Doc. 1, SF ¶ 1. In March 2020, Moody contends that P.A. Aremu began treating Moody's infection with antibiotics. *Id.*, ¶ 2. On March 17, the Covid-19 pandemic caused FSL to begin "modified operations." *Id.*, ¶ 3. Moody alleges that beginning on April 1, 2020, and because of the pandemic, "there was not sick-call" at FSL. *Id.*, ¶ 4. He also contends that his antibiotics ran out during this time and that he had "no correct way" to bring up his "continuing medical issues." *Id.*, ¶ 5.

Moody's medical records, however, show that he attended sick call on June 1, 2020, with P.A. Aremu, who suspected an infection of the penis, or phimosis. Ex. 2, Decl. of C.

---

[2] Exhibit numbers refer to exhibits to Federal Defendants' motion, unless otherwise noted.

Haynes, Attach. 1, FCI Jesup Health Services records 01/31/21 – 01/31/22 ("Ex. 2-1"), at 48. Aremu initiated antibiotic treatment, which were renewed on several occasions after June 2020. *See id.* at 86-90 (listing prescriptions).[3] Moody's records also reflect multiple clinical encounters with onsite providers in response to his complaints about the infected penis, among others. *See id.* at 1-57. These visits included two sick call encounters on June 1 (*id.* at 48, 54); sick call on June 25 (*id.* at 45); chronic care by onsite nurse practitioner Coleman, with medical doctor review, on July 21 (*id.* at 35-40); urinalysis on August 6 (*id.* at 28-29); sick call on September 1 (*id.* at 25); sick call on September 15, reviewed by P.A. Aremu, on September 15 (*id.* at 17-22); sick call, reviewed by N.P. Coleman, on October 22 (*id.* at 13-15); chronic care by Dr. Holbrook (M.D.) on October 27 (*id.* at 8); and sick call, reviewed by P.A. Aremu, on December 7 (*id.* at 4). During Moody's October 27 evaluation, Dr. Holbrook noted that Moody's condition "improve[d] with antibiotics and return[ed]." *Id.* at 8. At times, Moody missed sick call and reported instead to "pill line," which is supposed to focus on medication administration. *See, e.g.*, Ex. 2, Hynes Decl., Attach. 2, FCI Jesup Health Services records 01/31/22 – 01/31/23 ("Ex. 2-2"), at 6. Nevertheless, on October 22, Coleman referred Moody to a urologist. ECF Doc. 1, ¶ 15; Ex. 2-1, at 12. On March 1, 2021, Moody saw the urologist, Defendant Dr. Mark Byron, for a consultation, who recommended circumcision as the only option to treat

---

[3] The court may properly consider Moody's medical records, attached as exhibits to Federal Defendants' motion to dismiss, because the records are "refer[red] to . . . in the complaint and those documents are central to [his] claim" that defendants' recordkeeping and medical care was inadequate. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368-69 (11th Cir. 1997).

Moody's condition. ECF Doc. 1, ¶¶ 15-16, 18. After his urology appointment, Moody was seen at FSL by Hanchey, a nurse, who evaluated him and discussed the "pros and cons of circumcision," including that it may "take a long time to heal." Ex. 2-2, at 38. Moody agreed that circumcision was necessary to deal with the infection. ECF Doc. 1, Ex. 1, at 14 ("I agree that some kind of surgical [procedure] was need[ed.]"); Ex. 2-2, at 38 ("Circumcision and cystoscopy [Moody] agrees").

Moody now contends he was already circumcised shortly after his birth and that despite Dr. Byron's recommendation he could not have been circumcised again. ECF Doc. 1, ¶ SF 18. He further alleges that he requested to see another doctor, but the request was denied. *Id.*, ¶ 19. While awaiting his circumcision procedure, Moody continued to receive care at FSL, and defendants addressed his concerns. For example, on April 15, 2021, Hanchey evaluated Moody at FSL health services, during which she noted his complaints about "bleeding," explained that the urologist provided circumcision as the "only solution" for his phimosis. Ex. 2-2, at 35. Nurse Hanchey noted that Moody refused prescribed treatment, and when educated about the need for hygiene when cleaning his penis and the status of his circumcision appointment, Moody became "agitated" and left the visit with Hanchey. *Id.* On September 14, Drury responded to Moody's complaints about his penis swelling and that it "bleeds frequently." *Id.* at 26-27. Moody was scheduled for a follow-up with the nurse practitioner. *Id.* at 27. On September 22, Moody received a follow-up appointment, during which a nurse practitioner prescribed topical treatment, with hygiene conditions, and told him to follow-up at sick call if it got worse. *Id.* at 25. Moody again attended sick call a couple of weeks later, on October 8, regarding an

unrelated issue, but did not mention any concerns about his penis. *Id.* at 21. During a November 2 chronic care appointment, the nurse practitioner attended to Moody's various medical issues, including phimosis; recorded Moody's complaints of "occasional bleeding," but noted upon examination that no bleeding was evident during this visit; and explained to Moody that his circumcision procedure was scheduled and attempted to reassure him "to no avail" about scheduling and timing. *Id.* at 15.

On January 21, 2022, Moody was taken by two unnamed defendant-correctional officers to the local hospital for the circumcision, performed by Dr. Byron. ECF Doc. 1, SF ¶ 22. Moody contends that Dr. Byron "amputated" his penis and that the correctional officers failed to stop the amputation. *Id.*, ¶¶ 20, 22. Moody complained about the alleged amputation to Defendants Grimes and Scott (nurses), who both determined everything went fine with his surgery. *See id.*, ¶¶ 24-26. Moody also alleges that he asked Scott if he could see a doctor, was told he would see one, but never did. *Id.*, ¶ 25. According to medical records, Moody presented to Nurse Scott on January 26, complaining about the circumcision. Ex. 2-2, at 5. Nurse Scott notified the doctor and noted that Moody had not performed hygiene in the area of his circumcision and urged him to do so; she otherwise noted no immediate concerns. *Id.* at 6. Moody contends that the procedure did not relieve his penile infection, which is still present and has moved into his kidneys. ECF Doc. 1, ¶ SF 23.

## II.   Procedural Background

Moody properly pursued his claims first through the Bureau of Prisons administrative remedy process. *See id.*, SF ¶¶ 27-34. On September 12, 2022, Moody filed

a *pro se* complaint alleging, among others, deliberate indifference to his medical needs and failure to protect against seventeen individual defendants, including several current and former federal employees. ECF Doc. 1, Specific Pleadings (SP) ¶¶ 1-46. Moody also alleged state-law claims against Defendant Dr. Mark Byron, a physician who is not a current or former federal employee. *Id.* ¶¶ 46-54.

On October 27, the magistrate judge issued a report and recommendation for dismissal pursuant to 28 U.S.C. § 1915A of Moody's claims against Defendants Connors, Regional Director, Fikes, Martin, Geter, Carvajil, and Morgan. ECF Doc. 8. Moody objected. ECF Doc. 11. The District Court overruled Moody's objections and adopted the recommendation as its order. ECF Doc. 30. As a result, Moody's remaining claims comprise claims for deliberate indifference against Defendants Ward, Aremu,[4] Coleman, Hanchey, Grimes, Scott, and Drury; failure to protect against unnamed corrections officers; and state-law assault against Defendant Byron. *Id.* at 4-5.

## ARGUMENT

Federal Defendants are entitled to dismissal of the Complaint on several grounds. *First*, Moody fails to state a cognizable claim under *Bivens v. Six Unknown Named Agents* and its progeny. *Second*, Defendant Ward is absolutely immune from suit under the Public Health Services Act. *Third*, all Federal Defendants are entitled to qualified immunity and Moody otherwise fails to state a claim under the Eighth Amendment.

---

[4] Moody's complaint purported to sue Defendant Aremu as PC-C Bolagi. *See generally* ECF Doc. 1.

I.    **The Court should decline to create a new *Bivens* remedy for Moody's claims.**

Moody seeks damages against individual employees under *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics*, 403 U.S. 388 (1971); *see* ECF Doc. 1, at 1. Specifically, Moody's remaining claims allege deliberate indifference and failure to protect in violation of the Eighth Amendment. However, no such remedy exists under *Bivens*. His remaining claims should be dismissed on this ground alone.

Recent Supreme Court precedent makes clear that "expanding the *Bivens* remedy is now considered a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017); *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) ("[F]or almost 40 years, we have consistently rebuffed requests to add to the claims allowed under *Bivens*." (citing as examples eight cases from 1983 to 2017)).

Since deciding *Bivens* in 1971, the Supreme Court has approved an implied cause of action for constitutional violations in only three instances: to allow claims against federal narcotics agents for violating the Fourth Amendment's prohibition against unreasonable search and seizures (*Bivens*); to allow claims against a Congressman for violating the Fifth Amendment's prohibition against gender discrimination when he terminated an administrative assistant because she was a woman (*Davis*); and to allow claims against correctional officers for violating the Eighth Amendment by failing to provide adequate medical treatment for an inmate's severe asthma, which resulted in the inmate's death (*Carlson*). *See Abbasi*, 582 U.S. at 131; *Davis v. Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980). "These three contexts represent the only instances in which the Supreme Court has approved of an implied *Bivens* remedy."

7

*Montalban v. Samuels*, No. 21-11431, 2022 WL 4362800, at *3 (11th Cir. Sept. 21, 2022) (per curiam) (citing *Abbasi*, 582 U.S. at 131-32). And even these three cases "might have been different if they were decided today." *Abbasi*, 582 U.S. at 134. Just last year, in *Egbert v. Boule*, the bells tolled once more for *Bivens* when the Supreme Court declined to imply a remedy under the First and Fourth Amendments. 142 S. Ct. 1793 (2022); *see also Cohen v. United States*, No. 21-cv-10774 (LJL), 2022 WL 16925984, at *6 (S.D.N.Y. Nov. 14, 2022) ("Concluding [in *Egbert*], the Court all but held that *no* case would ever be able to satisfy [the *Bivens*] analytic framework, because 'if we were called to decide *Bivens* today, we would decline to discover any implied causes of action in the Constitution." (emphasis in original) (quoting *Egbert*, 142 S. Ct. at 1809)). While many litigants have sought to expand *Bivens*, "the Court has refused to do so for the past 30 years." *Abbasi*, 582 U.S. at 135.

The decline of *Bivens* entails an evolving analysis for determining whether a *Bivens* remedy exists. For a time, courts employed a two-step inquiry. First, courts determined whether a case presented a "new *Bivens* context," that is, whether the case was "different in a meaningful way" from prior *Bivens* cases decided by the Supreme Court; second, if the *Bivens* context was new, "a *Bivens* remedy would not be available if there [we]re 'special factors counseling hesitation in the absence of affirmative action by Congress.'" *Love v. Morales*, No. CV420-083, 2023 WL 2585004, at *3 (S.D. Ga. Feb. 21, 2023) (citation omitted) (first quoting *Abbasi*, 582 U.S. at 140; then quoting *id.* at 136 (quoting *Carlson*, 446 U.S. at 18)), *adopted by*, 2023 WL 2576840 (S.D. Ga. Mar. 20, 2023), *appeal docketed*, (11th Cir. Apr. 4, 2023). This approach narrowed into a singular inquiry following *Egbert*,

where the Supreme Court warned "against inquiring into 'whether *Bivens* relief is appropriate in light of the balance of circumstances in the "particular case,"' and instructed courts not to 'independently assess the costs and benefits of implying a cause of action,' raising doubt as to whether the two-step inquiry is necessary." *Id.* (quoting *Egbert*, 142 S. Ct. at 1798). "Instead, '[a] court faces only one question: whether there is *any* rational reason (even one) to think that *Congress* is better suited to "weigh the costs and benefits of allowing a damages action to proceed."'" *Id.* (emphasis in original) (quoting *Egbert*, 142 S. Ct. at 1805 (quoting *Abbasi*, 582 U.S. at 136)). Under this approach, a "court must ask more broadly if there is any reason to think that judicial intrusion into a given field might be harmful or inappropriate. Caselaw suggests the answer is almost always yes." *Id.* (citation omitted) (quoting *Egbert*, 142 S. Ct. at 1805); *see also Kaneakua v. Derr*, No. 22-cv-00201-DKW-WRP, 2023 WL 2539952, at *4 n.8 (D. Haw. Mar. 16, 2023) ("Numerous courts similarly understand *Egbert* as having worked drastic changes to [*Abbasi*]'s framework by reducing the [*Bivens*] analysis to a single question."). Even so, the two-step "rubric" is still relevant to this question. *See Love*, 2023 WL 2585004, at *3.

A.   Moody's claims arise in a new *Bivens* context, foreclosing a new remedy.

Moody's current remaining claims under the Eighth Amendment are a failure to protect claim against two unknown correctional officers[5] and deliberate indifference

---

[5] Moody purports to bring a failure-to-protect claim against Ward, Coleman, Hanchey, Grimes, Scott, and Drury, too, though these were arguably dismissed. *See* ECF Docs. 1, SP ¶¶ 11, 22; 30, at 4-5 (reciting remaining claims). In any event, Moody's allegations are insufficient, which is independently sufficient basis for dismissal, *Iqbal*, 556 U.S. at 678, and are not cognizable under *Bivens* for the reasons stated herein.

claims against Defendants Ward, Aremu, Coleman, Grimes, Drury, Hanchey, and Scott. Federal Defendants can demonstrate that Moody's claims fail under the two-step analysis described above because they arise in a new context and—in satisfaction of *Egbert*'s singular inquiry—there are multiple reasons not to imply a new *Bivens* remedy. Federal Defendants first demonstrate that Moody's claims arise in new contexts, by type of claim, and then address the many reasons the court should not imply a new *Bivens* remedy, as to all claims at once.

### 1. *Failure to Protect*

First, Moody's failure-to-protect claim arises in a new *Bivens* context. In *Abbasi*, the Supreme Court provided some guidance for determining whether a putative *Bivens* claims arises in a new context.

> Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the function of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Abbasi*, 582 U.S. at 139-40. "A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez*, 140 S. Ct. at 743. The Supreme Court instructs that courts should take a "broad" understanding of what constitutes a new context. *Id.* This latter point is particularly salient to the extent Moody attempts to shoehorn his claims under *Carlson*'s holding, which recognized a singular Eighth Amendment violation.

Indeed, Moody's case entails numerous meaningful differences foreclosing an extension of *Bivens* to his Eighth Amendment failure-to-protect claims. As a start, the Supreme Court has never explicitly recognized a *Bivens* claim for failure to protect. *See, e.g.*, *Clark v. Ciolli*, No. 1:21-cv-01081-SKO (PC), 2022 WL 17475718, at *4-8 (E.D. Cal. Dec. 6, 2022) (declining to recognize *Bivens* remedy for failure to protect inmate from Covid-19). Other courts have concluded that an Eighth Amendment failure-to-protect claim arises in a new *Bivens* context. *See, e.g.*, *Brooks v. Cheatham*, No. 5:21-cv-392-SPC-PRL, 2022 WL 18232648, at *5 (M.D. Fla. Dec. 6, 2022) ("The Supreme Court has never recognized a *Bivens* action for an Eighth Amendment failure-to-protect claim. Therefore, this claim presents a new context to which the Supreme Court has not extended *Bivens*.") (footnote omitted), *appeal dismissed sub nom.*, *Brooks v. F.B.O.P.*, No. 23-10002-D (11th Cir. Feb. 6, 2023); *Bulger v. Hurwitz*, 62 F.4th 127, 137-39 (4th Cir. 2023); *Hoffman v. Preston*, No. 20-15396, 2022 WL 6685254, at *1 (9th Cir. Oct. 11, 2022); *Greene v. United States*, No. 21-5398, 2022 WL 13638916, at *4 (6th Cir. Sept. 13, 2022). Where courts implied a remedy for failure to protect, they did so relying on *Farmer v. Brennan*, 511 U.S. 825 (1994)—a case that predates *Abbasi*, *Hernandez*, and *Egbert* by decades—and have only implied a remedy for a failure-to-protect claim involving "prisoner-on-prisoner violence." *E.g.*, *Bistrian v. Levi*, 912 F.3d 79, 90-91 (3d Cir. 2018); *Ballard v. Dutton*, No. 9:21-CV-1248 (LEK/CFH), 2023 WL 2262785, at *3-4 (N.D.N.Y. Feb. 28, 2023); *Garraway v. Ciufo*, No. 1:17-cv-00533-ADA-GSA (PC), 2023 WL 1446823, at *3-4 (E.D. Cal. Feb. 1, 2023), *appeal filed*, (9th Cir. Apr. 3, 2023). *But see Bulger*, 62 F.4th at 137-39 (rejecting argument that *Farmer* presents fourth *Bivens* context for prisoner-on-prisoner violence).

11

In any event, Moody's claim does not involve prisoner-on-prisoner violence so these cases, even if not already abrogated by *Egbert*, would provide no foothold for his claim.

Even if a failure-to-protect claim was viable, Moody's differs in meaningful ways from recognized *Bivens* contexts. Moody seeks the novel right to hold indirectly liable two unknown BOP correctional officers for injuries directly caused by a non-federal actor, Dr. Byron. This novel circumstance creates a new *Bivens* context because it "require[s] scrutiny of new categories of conduct and a new category of defendants." *Bulger*, 62 F.4th at 140. *Bulger* rejected a nearly identical *Bivens* claim where the plaintiff challenged conduct by "BOP employees involved in transferring inmates and managing the agency's housing system." *Id.*; *see also Greene*, 2022 WL 13638916, at *4 ("[Plaintiff]'s claim that officers, agents, and employees of the DOJ and OIG failed to protect him from the alleged Eighth Amendment violations by not investigating and remedying the abuse that he allegedly experienced also arises in a new context and involves a new category of defendants. Consequently, a *Bivens* remedy is unavailable.").

### 2. *Deliberate Indifference*

Moody's deliberate indifference claims against Ward, Aremu, Hanchey, Grimes, Drury, and Scott also arise in a new *Bivens* context. To begin, Moody is not entitled to a *Bivens* remedy simply because he invokes the same constitutional provision (VII Amendment) as a prior *Bivens* case, like *Carlson*. *Hernandez*, 140 S. Ct. at 743. Moreover, the differences in the type, context, and seriousness of Moody's alleged injuries indicate a new *Bivens* context. The district court in *Kaneakua* rejected similar claims where the plaintiff accused a BOP warden and doctor of ignoring his request for and delaying

treatment of a painful cyst in his ear. 2023 WL 2539952, at *1. Comparing to *Carlson*, the court concluded that "multiple factual differences" existed, requiring dismissal. *Id.* at *5. Even though both *Carlson* and *Kaneakua* involved Eighth Amendment claims for inadequate treatment of chronic conditions (in *Carlson*, severe asthma; in *Kaneakua*, a cyst) the *Carlson* plaintiff's condition "triggered an acute fatal event, whereas Kaneakua's circumstances, while painful and inconvenient, [we]re not life-threating." *Id.* Similarly, Moody did not have asthma and his condition, though painful and inconvenient, did not trigger an "acute fatal event." *Kaneakua* further distinguished *Carlson* because the allegedly inadequate care in that case took place over "several days," whereas the *Kaneakua* plaintiff's allegations spanned a period of at least two years. *Id.* at *1, 5. So too with Moody's claims, which not only spanned a number of years, but were also punctuated by consistent attempts by qualified healthcare providers to treat his condition with antibiotics; culminated in referral to an outside provider and surgical intervention; and were followed by aftercare by qualified healthcare personnel at FCI Jesup. *See also Vaughn v. Bassett*, No. 1:19-cv-00129-C, 2022 WL 4299720, at *3 (N.D. Tex. Sept. 19, 2022) ("But Plaintiff's case differs from *Carlson* in more than one meaningful way: unlike *Carlson*, Plaintiff did not have untreated asthma. And although the Court does not downplay Plaintiff's injury and alleged permanent disfiguration, his overall injury is measurably less serious than that in *Carlson*, as he obviously does not allege a significant failure of the medical delivery system that led to the prisoner's death. Thus, the instant case is a new context."), *appeal docketed*, No. 22-10962 (5th Cir. Oct. 6, 2022); *Ross v. Sullivan*, No. 1:20-cv-00351-HSO-BWR, 2022 WL 6884087, at *7 (S.D. Miss. Aug. 8, 2022)

(citing fact that inmate did not have mistreated chronic asthma and did not die in prison as basis for concluding that case presented new *Bivens* context), *adopted by*, 2022 WL 4131098 (S.D. Miss. Sept. 12, 2022); *Sharp v. U.S. Marshals Serv.*, No. 5:20-CT-03282-M, 2022 WL 3573860, at *7 (E.D.N.C. July 15, 2022) (concluding that plaintiff's "alleged injuries—dental pain, infected and bleeding gums, and a tooth breaking into pieces—are all vastly different from those in *Carlson*").

B.    Moody's claims also fail because there are numerous reasons the
Court should decline to recognize a new *Bivens* remedy.

The court should dismiss all of Moody's claims because there are multiple reasons that Congress, not the courts, should decide in the first instance whether inmates, like Moody, are entitled to the novel remedy Moody seeks. Whether or not his case arises in a new context, these reasons (or "special factors counseling hesitation") for not implying a *Bivens* remedy are standalone bases for dismissal. Some of the reasons apply to Moody's claims generally, and some are claim-specific. Each category is taken in turn.

1.    *There are reasons not to imply a Bivens remedy that are generally
applicable to all of Moody's claims.*

The first reason, and perhaps most important, is because Congress's inaction demonstrates an intent *not* to recognize claims like Moody's. Indeed, "Congress had occasion to consider the matter of prisoner abuse but chose not to create a standalone damages remedy against federal prison staff." *Montalban*, 2022 WL 4362800, at *4 (citing *Abbasi*, 582 U.S. at 148); *Abbasi*, 582 U.S. at 130 (noting that Congress enacted a remedy for constitutional violations by state actors, 42 U.S.C. § 1983, but "did not create an analogous statute for federal officials"); *Greene*, 2022 WL 13638916, at *4 ("[S]pecial

14

factors counsel against recognizing a new *Bivens* claim in this context, namely, that Congress has not created a cause of action for damages against federal corrections officers and officials."). Moreover, when Congress "passed the Prison Litigation Reform Act of 1995, [it] made comprehensive changes to the way prisoner abuse claims must be brought in federal court"; Congress had "specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs." *Abbasi*, 582 U.S. at 148. However, the PLRA "does not provide for a standalone damages remedy against federal jailers." *Id.* at 149; *see also generally* 42 U.S.C. § 1997e. In 2003, Congress returned to the arena of inmate abuse with the Prison Rape Elimination Act, to "protect the Eighth Amendment rights of . . . prisoners" and "increase the accountability of prison officials." 34 U.S.C. § 30302. Again, Congress did not create a damages remedy against federal prison staff, opting instead to authorize the Attorney General to issue regulations to prevent, investigate, and punish rape in prisons. *Id.* § 30307(a)(1)-(3).

Congress's hesitancy to allow individual suits for damages against prison personnel makes sense because Moody and all inmates have access to alternative remedial structures. This further warrants restraint when considering novel *Bivens* claims. "The BOP's [administrative remedies] process, which was available to [plaintiff], provided him an alternative means of relief that forecloses extension of a *Bivens* remedy." *Montalban*, 2022 WL 4362800, at *4 (citing *Abbasi*, 582 U.S. at 136-39). As many other courts have explained in their special factors analyses, a BOP inmate alleging inadequate medical care—particularly in a non-emergent situation, like Moody's here—can seek injunctive relief, file a complaint with the U.S. Department of Justice, Office of Inspector

General (DOJ-OIG), or even seek money damages from the government via the Federal Tort Claims Act (FTCA). *See, e.g.*, *Washington v. Fed. Bur. of Prisons*, No. 5:16-3913-BHH, 2022 WL 3701577, at *7 (D.S.C. Aug. 26, 2022) (injunctive relief); *Lu v. Kwon*, No. 22-00122 JMS-RT, 2023 WL 2456207, at *5 (D. Haw. Mar. 10, 2023) (FTCA); *Smith v. Garcia*, No. 21-cv-578 (NGG) (RJR), 2022 WL 17852393, at *6 (E.D.N.Y. Dec. 22, 2022) (OIG, FTCA); *Jones v. Hurley*, No. 6:22-130-DCR, 2023 WL 1452049, at *5 (E.D. Ky. Feb. 1, 2023) (OIG, injunctive relief, FTCA).

It is immaterial that Plaintiff exhausted his administrative remedies and was denied relief. *See Egbert*, 142 S. Ct. at 1808 ("[W]e have explained that the absence of relief does not by any means necessarily imply that courts should award money damages." (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 421 (1988)); *see also Bulger*, 62 F.4th at 141 ("The potential unavailability of a remedy in a particular circumstance does not warrant supplementing that scheme."). Notably, the Supreme Court "has never held that a *Bivens* alternative must afford rights such as judicial review of an adverse determination"; instead, the Court explains that "whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts." *Egbert*, 142 S. Ct. at 1806. "Courts have thus consistently held that the BOP's inmate grievance program provides a viable alternative remedy counseling against inferring a remedy under *Bivens*." *Jones*, 2023 WL 1452049, at *5 (citing cases).

"Additionally, separation of powers concerns further counsel hesitation, as [the Eleventh Circuit] has recognized that prison administration is best left to the legislative and executive branches of government." *Montalban*, 2022 WL 4362800, at *4 (citing *Pesci*

16

*v. Budz*, 730 F.3d 1291, 1296 (11th Cir. 2013) (recognizing that prison administration "is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.")); *see also* 18 U.S.C. § 4042(a)(2) (providing responsibilities of the BOP for care and custody of inmates, including healthcare). There is little doubt that a new *Bivens* remedy here runs "the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Abbasi*, 582 U.S. at 140. Thus, existing remedies counsel heavily against creating new ones.

> 2. *There are reasons not to apply a Bivens remedy specifically applicable to Moody's failure to protect claim.*

In addition to those mentioned above, there are concerns specific to allowing a *Bivens* remedy for the correctional officers' alleged failure to intervene in an outside provider's surgical procedure. To start, this runs a very real risk of "judicial intrusion" that would create the "potential" for "harmful" consequences. *Egbert*, 142 S. Ct. at 1805. The BOP is presently responsible for the custody and care of 158,730 federal inmates and has 34,367 employees. *See* BOP, *About Our Agency*, https://www.bop.gov/about/agency/ (last visited April 19, 2023). Allowing such claims would incentivize any inmate who allegedly received improper medical care from an outside provider to sue, individually, their escorting officers and allow them to survive a motion to dismiss by alleging they were at risk of harm from a given procedure that the officers should have prevented. Such liability would have unpredictable "systemwide consequences." *Egbert*, 142 S. Ct. at 1803.

Moreover, recognizing a new claim here could result in "a significant expansion of Government liability, [which] counsels against permitting *Bivens* relief." *Id.* at 1808

(quoting *F.D.I.C. v. Meyer*, 510 U.S. 471, 486 (1994)). Allowing Moody's claim to move forward "pose[s] an acute risk" of increasing "substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *Id.* at 1807 (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). "[C]reating a cause of action is a legislative endeavor," and one this Court should not undertake given the field and context that give rise to Plaintiff's claims. *Id.* at 1802.

Accordingly, the court should decline to extend *Bivens* and dismiss Moody's claims against Federal Defendants.

## II.     The Court should dismiss Ward because he is entitled to Absolute Immunity under the Public Health Services Act.

Defendant Ward is absolutely immune from Moody's claims. Section 233(a) of the Public Health Services Act (PHSA), 42 U.S.C. § 233(a), "grants absolute immunity to PHS officers and employees for actions arising out of the performance of medical functions within the scope of their employment by barring all actions against them for such conduct." *Hui v. Castaneda*, 559 U.S. 799, 806 (2010). Specifically, the PHSA provides:

> The remedy against the United States provided by sections 1346(b) and 2672 of Title 28, or by alternative benefits provided by the United States where the availability of such benefits precludes a remedy under section 1346(b) of Title 28, for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceedings by reason of the same subject-matter against the officer or employee (or his estate) whose act or omission gave rise to the claim.

42 U.S.C. § 233(a). A U.S. Public Health Service (PHS) employee acting within the scope

of employment is therefore immune from *Bivens* claims, and a tort claim against the United States under the FTCA is the exclusive remedy for persons claiming injury due to the alleged acts or omissions of a PHS employee. *Hui*, 559 U.S. 799, 806-07; *Dugan v. Jarvis*, 725 F. App'x 813, 816 (11th Cir. 2018) (per curiam); *Smith v. United States*, No. CV420-286, 2021 WL 2877926, at *1 (S.D. Ga. June 22, 2021), *adopted by*, 2021 WL 2877600 (S.D. Ga. July 8, 2021).

Defendant Ward is a commissioned officer in the PHS. Ex. 3, Decl. of Daniel Ward, ¶ 4. Moody's allegations against Ward exclusively derive from "the performance of medical . . . or related functions" by Ward within the scope of his employment at FCI Jesup. 42 U.S.C. § 233(a); *see also* ECF Doc. 1, SP ¶¶ 8-12. Accordingly, Ward is entitled to absolute immunity.

III.    **The Court should dismiss because Federal Defendants are entitled to qualified immunity.**

Qualified immunity protects governmental officials performing discretionary functions from civil liability so long as their conduct does not violate clearly established constitutional rights. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Courts must determine whether the allegations establish "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 735. If the state of the law at the time of the incident gave the defendant fair warning that the conduct was unconstitutional, the right is clearly established. *Hope v. Pelzer*, 536 U.S. 730, 741-46 (2002). Finally, even where the plaintiff

demonstrates a clearly established right, if an objectively reasonable officer would have thought the act was lawful, the officer is entitled to qualified immunity. *Anderson*, 483 at 638-39.

While defendants bear an initial burden of demonstrating the conduct at issue was a discretionary function, *see Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004), Moody bears the ultimate burden of showing defendants *are not* entitled to qualified immunity by demonstrating that the law allegedly violated was clearly established when defendants acted. *Barts v. Joyner*, 865 F.2d 1187, 1190 (11th Cir. 1989). Moody's burden cannot be discharged "simply by making general, conclusory allegations of some constitutional violation or by stating broad legal truisms." *Id.* Law becomes clearly established "by holdings, not by inferences from language in opinions." *Belcher v. City of Foley*, 30 F.3d 1390, 1400 (11th Cir. 1994). Unless the issue has been settled by the Supreme Court or Eleventh Circuit, an official is entitled to qualified immunity. *Courson v. McMillian*, 939 F.2d 1479, 1498 (11th Cir. 1991). And courts at the motion-to-dismiss stage may infer from the complaint obvious alternate explanations suggesting lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer. *Iqbal*, 556 U.S. at 682. Finally, and most importantly, "each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018); *Duff v. Steub*, 378 F. App'x 868, 871 (11th Cir. 2010) ("[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each Defendant must be judged separately and on the basis of what that person knows." (quoting *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir.

2008))).

Moody's fails to state a claim under the Eighth Amendment because Federal Defendants are entitled to qualified immunity. At all relevant times, they were performing discretionary functions, and Moody has failed to carry his burden on either prong of qualified immunity. That is, he cannot demonstrate a constitutional violation, and consequently cannot prove the relevant law was clearly established.

## A.   Federal Defendants were performing discretionary functions.

Federal Defendants were performing discretionary function during their many attempts to care for Moody, particularly during the Covid-19 pandemic. Discretionary function analysis considers "whether [a] public official was '(a) pursuing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were in his power to utilize.'" *Channel v. Smith*, No. CV317-060, 2018 WL 5315209, at *3 (S.D. Ga. Oct. 26, 2018) (quoting *Holloman*, 370 F.3d at 1265).

The unknown correctional officers' escort of Moody to his surgery was discretionary. There can be no dispute that prison escorts are a legitimate job-related function for a correctional officer. *See id.* at *3; *Smith v. Andrews*, No. CV 114–206, 2015 WL 4716037, at *4 (S.D. Ga. Aug. 7, 2015), *adopted by*, 2015 WL 5334222 (S.D. Ga. Sept. 10, 2015). Similarly, defendants' allegedly inadequate medical care resulted from discretionary functions. This Court has previously remarked that "it is clear that the decision to provide medical care to inmates is a discretionary function[.]" *Walsh v. Jeff Davis Cnty.*, No. 210-075, 2012 WL 12952564, at *15 (S.D. Ga. Mar. 29, 2012) (citing *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1329 (11th Cir. 2007)). Thus, the burden shifts to

Moody to show defendants violated his clearly established constitutional rights, which he cannot do.

      **B.**    <u>Defendants did not violate Moody's clearly established constitutional rights.</u>

        **1.** *Failure to Protect*

Moody alleges that correctional officers failed to protect him in violation of the Eighth Amendment during a medical escort. These allegations fail to demonstrate a clearly established constitutional violation.[6]

The Eighth Amendment's "prohibition on cruel and unusual punishments requires prison officials to 'take reasonable measures to guarantee the safety of the inmates.'" *Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021) (quoting *Farmer*, 511 U.S. at 832).

> To succeed on a failure-to-protect claim, a plaintiff must satisfy three elements. First, the plaintiff must show that she was "incarcerated under conditions posing a substantial risk of serious harm." Second, the plaintiff must show that the "prison official [had] a sufficiently culpable state of mind," amounting to "deliberate indifference." Third, and finally, the plaintiff must demonstrate causation—that the constitutional violation caused her injuries.

*Id.* at 1358 (alteration in original) (citations omitted) (first quoting *Farmer*, 511 U.S. at 834; then quoting *id.*). "Deliberate indifference exists when a prison official 'knows of and disregards an excessive risk to inmate health or safety.'" *Id.* (quoting *Farmer*, 511 U.S. at 837). Deliberate indifference has both an objective and a subjective element. *Id.* "A

---

[6] To the extent Moody also alleges that Ward, Coleman, Hanchey, Grimes, Scott, or Drury also failed to protect him, these allegations are inadequate to state a claim. *See Barts*, 865 F.2d at 1190; *Iqbal*, 556 U.S. at 678. Moreover, these claims fail on the deliberate indifference prong, as elaborated *infra*, Argument, Section III.B.2.

prisoner must establish 'both that [1] the defendant actually (subjectively) knew that [the prisoner] faced a substantial risk of serious harm and that [2] the defendant disregarded that known risk by failing to respond to it in an (objectively) reasonable manner.'" *Id.* (alterations in original) (quoting *Mosley v. Zachery*, 966 F.3d 1265, 1270 (11th Cir. 2020)). To satisfy the subjective component, a plaintiff must allege that before the harm occurred, defendants were "'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]' and that [they] dr[ew] the inference." *Id.* (first and last alteration in original) (quoting *Farmer*, 511 U.S. at 837).

Moody alleges that unnamed correctional officers failed to protect him by not intervening when Dr. Byron allegedly "amputated" his penis. ECF Doc. 1, SF ¶ 22. Plaintiff alleges that the officers escorted Plaintiff to and were present during his surgery; they had documentation showing that no amputation was to be performed at that time; and they witnessed the amputation without intervening. *Id.*, SP ¶ 5.

These allegations fail to show a failure to protect. Moody's allegations do not demonstrate how being taken to a medical provider's facility under the escort of two correctional officers constitutes conditions of confinement posing a serious risk of harm. Nor do Moody's allegations establish that the unnamed correctional officers acted with deliberate indifference. There are no allegations that the officers were aware of facts from which they *actually* inferred that Dr. Byron was about to harm Moody. Instead, Moody simply alleges that the officers "had documentation showing that no amputation was to be performed at that time." There are no allegations that the officers knew the procedure was supposed to be a circumcision. *See Id.*, SF ¶¶ 20, 22; SP ¶ 5. A reasonable correctional

23

officer lacking medical expertise and observing a circumcision would presume that a circumcision, not an amputation, was occurring; they would have no professional training to determine otherwise.

Moreover, access to medical records showing that Moody's surgery was a circumcision, rather than amputation, is not enough for constitutional liability. As one court recognized, "the causal link—if any—between access to records and a threat to safety is too tenuous to establish a failure to protect." *Conroy v. United States*, No. 16-cv-00750-SMY, 2016 WL 6610429, at *3 (S.D. Ill. Nov. 9, 2016). Moody has not shown how officers knowing a particular surgical procedure was to occur demonstrates subjective awareness of a threat to an inmate's safety when a doctor allegedly takes another course.

Indeed, a reasonable officer observing the surgical procedure would not conclude that just because tissue was being cut or removed, Plaintiff's penis was being amputated. "An official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly declined to act or if he knew of ways to reduce the harm but recklessly declined to act." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 620 (11th Cir. 2007). Even generously assuming the officers could tell that Dr. Byron was performing an amputation, rather than a circumcision, they would not know how to reduce the harm at that point or that such procedures were not indicated due to some medical exigency in which they are not trained. It is just as probable that the officer's attempt to stop the procedure might further harm Moody, for example, by delaying or preventing the doctor from closing the incisions, leading to blood loss or worse.

Accordingly, Defendants are entitled to qualified immunity as to Moody's failure-

to-protect claim.

2. *Deliberate Indifference*

Prisoners have a constitutional right to receive adequate medical care while in custody. *See generally Estelle v. Gamble*, 429 U.S. 97 (1976); *Farmer*, 511 U.S. at 825. A prisoner must demonstrate that prison officials acted with "deliberate indifference to [their] serious illness or injury" to state a claim under the Eighth Amendment. *Estelle*, 429 U.S. at 110. "Mere allegations of negligence or medical malpractice do not state a valid claim of constitutional medical mistreatment." *Bell v. Sec'y of Fla. Dep't of Corr.*, 491 Fed. App'x 57, 59 (11th Cir. 2012). Rather, to succeed on a claim of deliberate indifference to serious medical need, a plaintiff must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Id.*

Moody must therefore satisfy both an objective requirement and a subjective requirement. *Bingham v. Thomas*, 654 F.3d 1171, 1175-76 (11th Cir. 2011). The objective component is demonstrated by showing a serious medical need because a "physician has diagnosed [it] as requiring treatment or [because it] is so obvious that even a lay person would recognize the need for a doctor's attention." *Bell*, 491 F. App'x at 59. The need must also pose a substantial risk of serious harm if left unattended. *Id.* The subjective component is demonstrated by showing actual knowledge of a risk of serious harm that is disregarded with more than mere negligence. *Id.*

Critically, medical judgments are not enough to show deliberate indifference. *See id.*; *Estelle*, 429 U.S. at 107. "For example, '[a] medical decision not to order an X-ray, or

25

like measures, does not represent cruel and unusual punishment,' even if it was medical malpractice not to do so." *Id.* (quoting *Estelle*, 429 at 107). "Generally, a plaintiff does not establish deliberate indifference merely because, although he received medical attention, he desired different modes of treatment than what he received." *Id.* And it is well settled that, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1272 (11th Cir. 2020) (alteration in original) (quoting *Harris v. Thigpen*, 941 F.2d 1395, 1507 (11th Cir. 1991)).

Moody has failed to clear the high hurdles required to state a claim for deliberate indifference. Even assuming *arguendo* that he has a serious medical need, he failed to demonstrate that Defendants violated clearly established law by acting with deliberate indifference to this need. To review, the totality of Plaintiff's allegations against Aremu, Coleman, and the other nurse defendants (Hanchey, Grimes, Scott, and Drury) consist of the following:

1. On or after July 2020, Ward failed to respond to Moody's complaints about his infection and potential amputation. ECF Doc. 1, SP ¶¶ 8-12.
2. In March 2020, Defendant Aremu prescribed an initial regimen of antibiotics which proved unsuccessful, and then continued to prescribe antibiotics with gaps between regimens. *Id.* SF ¶ 2, SP ¶ 15.
3. Between March 1, 2020, and May 30, 2020, each time he requested a doctor, Aremu, Coleman, and other nurse defendants told him "we don't have one." *Id.* SF ¶ 7.
4. Moody attempted to notify Coleman and the other nurse defendants that his infection had returned during pill lines between April 1, 2020, and May 30, 2020, and complains that they refused to listen to his "state of emergency," told him to report to "the non-existent sick call," and otherwise failed to chart his complaints. *Id.* SF ¶ 6-7, 14; SP ¶¶ 19-22.
5. On January 26, 2022, Moody was seen by Scott after his circumcision, who stated that he would be called back that day to see a doctor. *Id.* SF ¶ 24. He was not called

back to see a doctor that day. *Id*. SF ¶ 25.

6. On January 27, 2022, Moody was evaluated by Defendant Grimes at sick call, who stated that "the amputation site" "looks OK"; Defendant Scott concurred with that assessment. *Id*. at SF ¶ 24-26.

This conduct is insufficient to overcome qualified immunity. "[M]ere negligence or a mistake in judgment does not rise to the level of deliberate indifference." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1308 (11th Cir. 2009). Even assuming the allegations are true, they do not demonstrate more than mere negligence. *See Bingham*, 654 F.3d at 1176 (defining what constitutes more than mere negligence). To the contrary, Plaintiff's medical records and allegations demonstrate defendants many attempts to provide him care during the upheaval of the Covid-19 pandemic. *See supra*, Background, Section I.; Exs. 2-1, 2-2.

The fact that plaintiff received consistent care, even if it was arguably negligent or not what Moody wanted, is insufficient to overcome qualified immunity. *See, e.g.*, *Bell*, 491 F. App'x at 59-60; *Hoffer*, 973 F.3d at 1272. Moody's allegations show that he received antibiotic treatment in March 2020, ECF Doc. 1, SF ¶ 2; Coleman referred him to a urologist in October 2021, which was approved in November, *id.*, SF ¶ 15; and he was taken to a urologist in March 2021, *id*. The documents Moody attached to his complaint show Moody's agreement that "some kind of surgery was need[ed.]" *Id.* at 14; Compl. Ex. 4, at 31-33. Although Moody contends that sick call was "canceled" due to the pandemic after April 2020, *see id.*, SF ¶ 4, he admits he received "multiple 10-day prescriptions of antibiotics" around July 2020, *id.*, SF ¶ 12. He also admits that he saw Defendants Aremu, Coleman, and Hanchey "from March 1, 2020 to July 14, 2021" for "Health Services Consultations." *Id.*, SF ¶ 14. Thus, it is clear that Moody had access to care, just not the

sick call he wanted or may have been used to, due entirely to the Covid-19 pandemic precautions taken at FCI Jesup for the safety and security of the inmates and staff. *See id.*, SF ¶ 3 ("On March 17, 2020, the [FSL] Facility began modified operations due to the coronavirus pandemic."). His medical records also show numerous interactions with defendants and other health care staff who attempted to provide him care during this trying time. *See supra* Background, Section I.

Moody's allegations obliquely advance a theory that his condition was exacerbated by an alleged delay in care. Even so, these allegations do not demonstrate deliberate indifference. The Eleventh Circuit has "explained that '[d]elay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.'" *Ravan v. Talton*, No. 21-11036, 2023 WL 2238853, at *7 (11th Cir. Feb. 27, 2023) (per curiam) (quoting *Hill v. DeKalb Reg'l Youth Ctr.*, 40 F.3d 1176, 1188-89 (11th Cir. 1994), *overruled in part on other grounds by Hope*, 536 U.S. at 739 n.9).

District courts have consistently refused to find deliberate indifference when the alleged delay in medical care was connected to pandemic-related delays. *See, e.g.*, *Barbosa v. Ndu*, No. 1:21-cv-00251-SAB (PC), 2022 WL 9444217, at *7 (E.D. Cal. Oct. 14, 2022) ("Plaintiff has not alleged facts from which the Court could plausibly infer that any delays or inadequacies in his care are indicative of deliberate indifference as opposed to negligence or (in the case of COVID-related delays) a reasonable administrative concern."); *Damond v. City of Baton Rouge*, No. 20-839-JWD-RLB, 2022 WL 3273629, at *6 (M.D. La. July 7, 2022) (finding no deliberate indifference where officials attempted to

schedule HIV testing, but "testing was ultimately delayed due to COVID-19 rather than deliberate indifference on the part of any of the [defendants]"), *adopted by*, 2022 WL 3273275 (M.D. La. Aug. 10, 2022); *Pearson v. Manlove*, No. 20-cv-487-WMC, 2021 WL 1966601, at *2 (W.D. Wis. May 17, 2021) (holding that plaintiff's allegations that defendants failed to respond to his medical needs because it appeared that "at least some of the delay . . . was caused by restrictions imposed by the Covid-19 pandemic[,] in which ordinary citizens across the country, not just those in prisons, were being temporarily denied treatment for non-urgent health conditions."). Moody acknowledges that the Covid-19 pandemic caused changes to FSL's operations. *See* ECF Doc. 1, SF ¶¶ 3-5, 10, SP ¶ 24. This included the ability to transfer prisoners outside of FCI Jesup, like Moody's transfer for his urology referral. Moody fails to show any issues resulting from these operational changes were caused by defendants' actions, rather than the pandemic or outside providers own scheduling issues over which defendants had not control. *See, e.g.*, *Williams v. Young*, No. 4:15cv219-RH/CAS, 2016 WL 9444357, at *2 (N.D. Fla. Sept. 28, 2016) (finding no deliberate indifference based on delayed surgical procedure "defendants had nothing do with"); *Flanagan v. Burgos*, No. Civ.A. CV204141, 2005 WL 3358886, at *4 (S.D. Ga. Dec. 9, 2005) (no deliberate indifference where provider did "not appear to have had a direct role" in plaintiff's treatment).

Additionally, an individualized look at the defendants' alleged conduct galvanizes the conclusion they were not only acting without deliberate indifference, but that they did all they could to treat Moody's needs and respond to his complaints.

### i.   Aremu

Moody's claim that Aremu's March 2020 antibiotic prescription was unsuccessful, and allegedly resulted in an increased "microbial resistance to medications," ECF Do. 1, SP ¶ 15, is insufficient to constitute deliberate indifference. Indeed, "'a simple difference in medical opinion between the prisoner's medical staff and the inmate as to the latter's diagnosis or course of treatment' does not support a claim of deliberate indifference." *Gomez v. Lister*, No. 22-10808, 2022 WL 16776248, at *3 (11th Cir. Nov. 8, 2022) (per curiam) (quoting *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020)). Even assuming Aremu's course of treatment was mistaken, it was not deliberately indifferent. *See, e.g.*, *Mann*, 588 F.3d at 1308.

### ii.   Ward

In addition to absolute immunity, Ward is also entitled to qualified immunity. While Moody alleges that in July 2020, he "complained specifically" to Ward about his "fears that the delay in treatment would result in the amputation of his penis," Moody does not allege how Ward caused the alleged delay in treatment. ECF Doc. 1, SF ¶ 32. Ward was not alleged to be one of Moody's direct care providers; nor is Ward alleged to be responsible for Moody's delayed appointment with Dr. Byron; instead, the "obvious alternative explanation" is that this delay was due not to Ward's actions, but the Covid-19 pandemic. *See id.*, SF ¶¶ 3-4; *see also Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567); *see also Williams*, 2016 WL 9444357, at *2.

### iii.   Coleman, Hanchey, Grimes, Scott, and Drury

As a threshold matter, dismissal of claims against these defendants is justified for

the sole reason that Moody's allegations are insufficiently particularized. *See, e.g.*, *Beyard v. Caddo Parish Comm'n*, No. 06-2296, 2007 WL 1741970, at *4 (W.D. La. Apr. 27, 2007) ("Plaintiff's conclusory and generic allegations that lump all defendants in one group are insufficient to defeat the qualified immunity defense raised by the individual movants.").

Moreover, even accepting Moody's shotgun pleading, he fails to allege sufficient facts to demonstrate that these provider-defendants were deliberately indifferent to his needs and thus not entitled to qualified immunity. For example, as to claims that defendants failed to chart Moody's condition, this court previously recognized that "failure to maintain accurate medical records does not constitute deliberate indifference." *Jenkins v. Wilcher*, No. CV419-337, 2021 WL 5467027, at *4 (S.D. Ga. Oct. 22, 2021) (citing cases), *adopted by*, 2021 WL 5456977 (S.D. Ga. Nov. 22, 2021). And even viable claims relating to inadequate recordkeeping require substantially different facts, like institutional "systemic" deficiencies, which Moody's allegations do not establish. *See, e.g.*, *Anderson v. Hall*, No. 5:19-cv-6, 2020 WL 2896682, at *3 (S.D. Ga. May 29, 2020), *adopted by*, 2020 WL 3406329 (S.D. Ga. June 19, 2020); *Davis v. Caruso*, No. 07-cv-11740, 2009 WL 878193, at *2 (E.D. Mich. Mar. 30, 2009) (citing cases for the proposition that "Eighth Amendment violations stemming from inadequate, incomplete, or mislaid medical documents are typically reserved for claims alleging systemic inadequacies in a jail's or prison's systems of medical record keeping").

Moody also fails to establish a causal connection between a specific defendant's failure to record a specific issue and his alleged injury. In *Jenkins*, for example, this court dismissed a claim based on failure to document a medical examination because the

inmate-plaintiff failed to allege that the omission caused injury—"an essential component of a claim under the Eighth Amendment." 2021 WL 5467027, at *4; *see also Anderson*, 2020 WL 2896682, at *3 (S.D. Ga. May 29, 2020). Similarly, Moody has failed to allege how the failure to chart certain of his complaints caused his infection, alleged amputation, or any alleged complications resulting therefrom.[7]

Turning next to Moody's claims that defendants referred him to a non-existent sick call, these allegations fail for two reasons. First, Moody's claims should not be accepted at face value because they are plainly contradicted by other allegations[8]—it is clear that Moody had access to healthcare providers and received treatment from April 2020 through March 2021. *See* ECF Doc. 1, SF ¶ 12 (averring Moody received "multiple 10-day prescriptions of antibiotics); ¶ 14 (averring Moody "saw" Aremu, Coleman, and Hanchey "from March 1, 2020 to July 14, 2021"); SF ¶ 15 (averring Coleman made a request for Moody to see an outside urologist). Moreover, it is clear that from Moody's circumcision in January 2022 and thereafter, he regularly interacted with healthcare staff. *See id.* ¶¶ 20-26.

Second, even accepting Moody's allegations that his access to sick call was restricted, his claims still fail to allege a constitutional violation. Moody's disagreement

---

[7] Moody's medical records also demonstrate that, in fact, the provider-defendants did chart his complaints, including bleeding, Moody's contrary assertions notwithstanding. *Compare* Ex. 2-2, at 15, 26-27, 35, *with* ECF Doc. 1, SF ¶¶ 14, 21.

[8] It is also clear from medical records that sick call at FCI Jesup did not cease during the Covid-19 pandemic, and that Moody was, in fact, seen numerous times during the period he alleges there was no sick call. *See generally* Exs. 2-1, 2-2.

with what sick call should look like, how he should be seen, or who he should see, are not actionable under the Eighth Amendment. That is, his complaints that he was evaluated by nurses (Hanchey, Scott, Drury, and Grimes), a physician's assistant (Aremu), and a nurse practitioner (Coleman), are not sufficient to establish deliberate indifference because this amounts to a mere disagreement regarding his course of treatment. *Estelle*, 429 U.S. at 106-07; *Hutchinson v. Wexford Health Servs.*, 638 F. App'x 930, 933 (11th Cir. 2016). Indeed, courts have rejected such claims alleging "disagreements as to the proper party and technique to diagnose [a plaintiff's] medical condition" because "a prisoner has no right to dictate the course of his medical treatment." *Green v. Shaw*, No. 3:17-cv-00913 (CSH), 2019 WL 1427448, at *9 (D. Conn. Mar. 29, 2019).

Moody also does not allege facts showing defendants' subjective awareness of a serious risk of harm when they told him to report to sick call or that he would see a doctor. And there are no allegations they impeded his access to such care or could control his access to a doctor. That they knew he had not received care is not enough. *See Milton v. Turner*, 445 F. App'x 159, 164-65 (11th Cir. 2011) (holding that prisoner failed to state a claim for deliberate indifference where officer was only informed that inmate was refused care). Nor is telling an inmate that care is unavailable enough even if they "delivered that news tactlessly." *Hines v. Parker*, 725 F. App'x 801, 806 (11th Cir. 2018) (per curiam). Further, even if defendants' treatment was the result of a misdiagnosis or "fail[ure] to recognize the severity of his medical condition—even if their mistake was obvious or highly consequential—cannot, standing alone, support an Eighth Amendment claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y.

2001).

Lastly, because Moody "failed to establish a deprivation of a constitutional right at all, [he] *a fortiori* has not established a violation of any clearly-established constitutional right." *Brown v. Cochran*, 171 F.3d 1329, 1333 (11th Cir. 1999).

Accordingly, all defendants are entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the Court grant their motion and dismiss the complaint.

Dated: April 24, 2023,                     Respectfully submitted,

                                           JILL E. STEINBERG
                                           UNITED STATES ATTORNEY

                                           */s/ Stephen Morrison*
                                           Stephen D. Morrison, III
                                           Assistant United States Attorney
                                           MN Bar No. 0401401
                                           P.O. Box 8970
                                           Savannah, GA 31412
                                           (912) 652-4422 (main)
                                           Email: stephen.morrison@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that the foregoing document has been served via electronic filing using the Court's CM/ECF system and by mailing a copy of the same to the following:

Robert Moody
22324-021
2680 U.S. Hwy 301 South
Jesup, GA 31599

Dated: April 24, 2023,                          */s/ Stephen Morrison*
                                                  Stephen D. Morrison, III
                                                  Assistant United States Attorney